**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **RENE GOTAY,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**TRANSUNION, LLC**,<br><br>Defendant. | Case No. ___________________<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Rene Gotay ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant TransUnion, LLC ("TransUnion" or "Defendant"), and alleges upon personal knowledge as to his own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this class action against TransUnion for its failure to properly secure and safeguard the personally identifiable information ("PII")[1] of Plaintiff and over 4.4 million individuals (collectively, the "Class" or "Class Members").[2]

2. Defendant is one of the nation's largest consumer credit reporting agencies, and as part of its business, requires its customers to submit PII.

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] Brian Sloan, *TransUnion data breach impacts more than 4.4 million Americans*, CNBC (Sept. 3, 2025) https://www.cnbc.com/select/transunion-data-breach-impacts-over-4-million/.

3. Plaintiff and Class Members provided their PII in connection with receiving services from Defendant.

4. By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5. On July 30, 2025, Defendant discovered a data breach that had occurred in an application connected to its vendor Salesforce on July 28, 2025, exposing the PII of 4.4 million of Defendant's U.S. customers ("Data Breach").

6. Defendant failed to adequately protect Plaintiff's and Class Members' PII. This PII was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

7. Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of its inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal law.

8. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to ensure it had adequate and reasonable safeguards and measures in place to protect the PII of Plaintiff and Class Members. More specifically, Defendant

failed to ensure that it had taken and implemented available steps to prevent an unauthorized disclosure of data, and failed to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

9. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe in any further transfers of their sensitive data to third parties and they should be entitled to injunctive and other equitable relief.

10. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant's fail to undertake appropriate and adequate measures to protect the PII.

11. Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

12. Plaintiff Rene Gotay is, and at all times relevant hereto was, a citizen of the State of Florida, residing in Davenport, Florida.

13. Defendant is a Delaware limited liability company with its principal place of business located at 555 W. Adams St., Chicago, Illinois 60661.

## JURISDICTION & VENUE

14. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class members who are diverse from Defendant, and (4) there are more than 100 Class members.

15. The Court has general personal jurisdiction over Defendant because Defendant is headquartered in this District.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District.

## FACTUAL ALLEGATIONS

***Defendant Collects and Stores its Customers' Private Information***

17. TransUnion is one of the largest credit reporting and service companies in the United States, with millions of customers across the United States. TransUnion employs thousands of people and generates over $4 billion in annual revenue.

18. As part of its business, Defendant receives and maintains the PII of millions of its current and former clients. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law.

19. Under state and federal law, businesses like Defendant have duties to protect the PII in its custody and to notify owners of said PII about data breaches.

20. Defendant acknowledges these duties in its Privacy Policy:

> "We maintain a comprehensive information security program with administrative (policies, standards, and processes), physical, and

> technical controls designed to protect the confidentiality, integrity, and accessibility of personal information. When handling categories of sensitive personal information such as Social Security numbers, we: (i) protect the confidentiality of Social Security numbers, (ii) prohibit their unlawful disclosure, and (iii) limit access to them only to the individuals for whom access is required for the performance of their job duties and the purpose for which the Social Security numbers were collected."[3]

***The Data Breach***

21. On July 28, 2025, TransUnion experienced a data breach which exposed the PII of over 4.4 million customers.[4] TransUnion did not discover this breach until until two days later on July 30, 2025.

22. On or about August 26, 2025, Defendant began sending out notice of breach letters ("Notice Letter"). The Notice Letter states that Defendant "experienced a cyber incident involving unauthorized access to some of your personal data that was stored on a third-party application."[5]

23. In other words, Defendant's cyber and data security systems were so completely inadequate that it allowed cybercriminals to obtain files containing a treasure trove of thousands of its clients highly private PII for multiple days.

24. TransUnion has not disclosed the specific data types that were exposed in the Data Breach, but according to its Notification to the Attorney General of Maine, the breach impacted at least 4,461,511 individuals."[6]

---

[3] *TransUnion Customer & Partner Portal Privacy Notice*, TRANSUNION, https://www.transunion.com/privacy/portal (last visited Sept. 3, 2025).
[4] Office of the Maine A.G., *Data Breach Notifications,* MAINE.GOV, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Sept. 4, 2025).
[5] CA – Sample Consumer Letter, *Notice of Data Breach*, TRANSUNION, (August 2025) https://oag.ca.gov/system/files/U.S.%20Adult%20Consumer%20Letter.pdf (last visited Sept. 3, 2025).
[6] Office of the Maine A.G., *supra* note 4.

25. On or around August 25, 2025—a month after the Data Breach occurred—TransUnion began notifying impacted individuals.

26. When Defendant did notify the Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of identity theft, providing Plaintiff and the Class with credit monitoring and "proactive fraud assistance" services.[7]

27. Even with several months' worth of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

28. Due to the obfuscating language in TransUnion's Breach Notice, it is unclear when the Data Breach occurred, how long cybercriminals had access to client PII, and how the Data Breach occurred.

29. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from stealing PII in its care. And thus, Defendant caused widespread injury and monetary damages.

30. Worryingly, this incident is only part and parcel of Defendant's pattern of negligent data security. Just three years ago, in August 2022, TransUnion sent a Notice of Security Incident regarding a data breach that impacted customers' personal data.[8]

---

[7] CA – Sample Consumer Letter, *supra* note 5.
[8] CA – Sample Consumer Letter, *Notice of Data Breach*, TRANSUNION, (August 2022) https://oag.ca.gov/system/files/CA%20-%20Sample%20Consumer%20Letter.pdf (last visited Sept. 3, 2025).

31. This previous incident further evidences Defendant's lack of adequate cybersecurity measures.

32. Since the Data Breach, Defendant claims that it will "continue to enhance our security controls as appropriate to minimize the risk of any similar incident in the future."[9]

33. But such simple declarations are insufficient to ensure that the Plaintiff and Class Members' PII will be protected from additional exposure in a subsequent data breach. Indeed, such steps to "minimize risk" should have been in place *before* the Data Breach.

34. TransUnion has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate the Plaintiff and Class Members for the injuries that Defendant inflicted upon them.

35. Because of TransUnion's Data Breach, the sensitive PII of the Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon the Plaintiff and Class Members.

36. Ransomware groups can monetize stolen PII and sell it on the dark web as part of a full identity profile.[10] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[11]

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

---

[9] CA – Sample Consumer Letter, *supra* note 5.

[10] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (listed visited Sept. 3, 2025).

[11] *Id.*

37. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

38. In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[12]

39. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation's ("FBI") 2024 Internet Crime Report details that reported losses from internet crime exceeded $16 billion in 2024 – a 33% increase from the prior year.[13]

40. According to the *2023 Annual Data Breach Report*, the number of data compromises in 2023 nearly doubled compared to 2022.[14]24 And in 2023, a record 3,205 breaches occurred, exposing the data of approximately 353,027,892 victims.[15]25

41. And, in 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[16]

42. Cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack.[17]

---

[12] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

[13] FBI National Press Office, *FBI Releases Annual Internet Crime Report,* (Apr. 23, 2025), https://www.fbi.gov/news/press-releases/fbi-releases-annual-internet-crime-report.

[14] *Identity Theft Resource Center 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High*, IDENTITY THEFT RESOURCE CENTER (Jan. 25, 2024) https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited Sept. 4, 2025).

[15] *Id.*

[16] *2024 Data Breach Report* at 6, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited Sept. 4, 2025).

[17] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted- ransomware.

43. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***FTC Guidelines Prohibit Defendant from Engaging in Unfair or Deceptive Acts or Practices.***

44. Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

45. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[18]

46. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[19]

47. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security

---

[18] *Start with Security – A Guide for Business* (2015), FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Sept. 4, 2025).

[19] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 4, 2025)

measures.[20]

48. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49. Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

50. Defendant was at all times fully aware of its obligations to protect the PII of its customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Violated Industry Standards.***

51. Several best practices have been identified that, at a minimum, should be implemented by entities in possession of PII, like Defendant, including but not limited to: educating all employees; vetting all vendors; using strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data.

52. Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and

[20] *Id.*

routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

53. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

54. These foregoing frameworks are existing and applicable industry standards for entities in possession of PII, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***The Monetary Value of Plaintiff's & Class Members' Private Information***

55. As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII.

56. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identifying fraud is only about 3%.[21]

57. A robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the dark web.

[21] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Sept. 4, 2025).

58. At an FTC public workshop in 2001, then Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third-party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[22]

59. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[23]

60. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[24]

61. Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information.[25] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that

[22] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N, at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Sept. 4, 2025).

[23] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, WALL STREET J.(Feb. 28, 2011), https://www.wsj.com/articles/SB10001424052748703529004576160764037920274 (last visited Sept. 4).

[24] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N, (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Sept. 4).

[25] Angwin & Steel, *supra*, note 23.

information. And, by making the transaction transparent, consumers will make a profit from their PII. This business has created a new market for the sale and purchase of this valuable data.

62. Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[26]

63. The ramifications of Defendant's failure to keep its customers' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for 6 to 12 months or even longer.

64. At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the PII it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

65. Upon information and good faith belief, if Defendant had remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented the attack into its systems and, ultimately, the theft of the PII of customers within its systems.

66. The compromised PII in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.

67. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer,

[26] *See* U.S. DEP'T OF JUSTICE, *Victims of Identity Theft* (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Sept. 4).

computer or device even if the individual pieces of data do not constitute PII."[27] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[28]

68. Based upon information and belief, the unauthorized parties have already utilized, and will continue to utilize, the PII they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that can be misused.

69. In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

70. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

71. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' PII to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

72. Given these facts, any company that transacts business with customers and then compromises the privacy of customers' PII has thus deprived customers of the full monetary value of their transaction with the company.

---

[27] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N, at 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework (last visited Sept. 4, 2025).

[28] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

73. In short, the data exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

***Plaintiff & Class Members Have Suffered Compensable Damages***

74. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways.

75. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

76. In order to mitigate against the risks of identity theft and fraud, Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their financial statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

77. Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

78. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach.

79. Plaintiff and Class Members now face a greater risk of identity theft.

80. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its customers' PII.

81. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their PII to strangers.

82. Plaintiff and Class Members also did not receive the full benefit of their bargain when accessing Defendant's services. Instead, they received services of a diminished value to those described in their agreements with Defendant. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

83. Plaintiff and Class Members would not have obtained services from Defendant had they known that Defendant failed to implement proper data security practices to safeguard their PII from criminal theft and misuse.

84. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their PII remains secure and is not subject to further misappropriation and theft.

85. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. Loss of the opportunity to control how their PII is used;

b. Diminution in value of their PII;

c. Compromise and continuing publication of their PII;

d. Out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. Lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of their stolen PII; and

h. Continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

86. Defendant's failure to promptly and properly notify the Plaintiff and Class Members of the Data Breach exacerbated the Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Plaintiff's Experience***

87. Plaintiff Rene Gotay is a customer of TransUnion.

88. As a condition of obtaining services from Defendant, he was required to provide his PII to Defendant.

89. Defendant maintained Plaintiff's PII in its systems at the time of the Data Breach.

90. On or about August 26, 2025, Plaintiff received a notice of the Data Breach from TransUnion, informing him that his PII including his name, date of birth, and Social Security number, was likely accessed and acquired from Transunion's files by unauthorized cyber criminals.

91. Plaintiff is very careful about sharing his sensitive PII. He stores any documents containing PII in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

92. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

93. Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data

Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

94. Plaintiff additionally suffered actual injury in the form of his PII being disseminated, on information and belief, on the dark web as a result of the Data Breach.

95. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harm caused by the Data Breach.

96. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

97. Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

98. Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated for the Class defined below, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

99. Plaintiff seeks to represent a Nationwide Class of persons to be defined as follows:

> All individuals residing in the United States whose PII was compromised in the Data Breach that was discovered by TransUnion in August 2025 and who received a Data Breach notification from Defendant.

100. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is

assigned, and the members of their immediate families, all judges assigned to hear any aspect of this litigation, their immediate family members, and those individuals who make a timely and effective election to be excluded from this matter using the correct protocol for opting out.

101. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

102. **Numerosity**: The proposed class is so numerous that joinder of all members is impracticable. Plaintiff is informed and believes, and thereon alleges, that there are, at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are ascertainable through Defendant's records, including but not limited to the files and records related to the Data Breach.

103. **Commonality:** This action involves questions of law and fact common to the Class that predominate over any questions affecting solely individual members of the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to protect the PII of Plaintiff and Class Members' PII;

b. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

c. Whether and when Defendant actually learned of the Data Breach;

d. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII, and breached its duties thereby;

e. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

f. Whether Defendant violated federal law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant adequately addressed and fixed the vulnerabilities that allowed the Data Breach to occur;

i. Whether Defendant's negligence resulted in the Data Breach;

j. Whether Defendant entered into an implied contract with Plaintiff and Class Members;

k. Whether Defendant breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PII;

l. Whether Defendant was unjustly enriched;

m. Whether Plaintiff and Class Members are entitled to actual, statutory, and/or nominal damages as a result of Defendant's wrongful conduct; and

n. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

104. **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class had all sought and/or received services from Defendant, each having their PII exposed and/or accessed by an unauthorized third party.

105. **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

106. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this

controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

107. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device particularly efficient and appropriate to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

108. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

109. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth herein.

110. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are

appropriate on a class-wide basis.

111. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiff and the Class of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard customer PII; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

112. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

113. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class.

114. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## CAUSES OF ACTION

## COUNT I
### NEGLIGENCE
***(On Behalf of Plaintiff and the Class)***

115. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

116. Plaintiff brings this claim on behalf of himself individually and on behalf of the Class.

117. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

118. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

119. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. As a result of a successful attack directed towards Defendant that compromised Plaintiff's and Class Members' PII, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur:

a. Mismanaging its system and failing to identify reasonably foreseeable internal

and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII;

b. Mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c. Failing to design and implement information safeguards to control these risks;

d. Failing to adequately test and monitor the effectiveness of key controls, systems, and procedures;

e. Failing to evaluate and adjust its information security requirements in light of the circumstances alleged herein;

f. Failing to detect the breach at the time it began or within a reasonable time thereafter;

g. Failing to follow its own privacy policies and practices published to their customers regarding its oversight; and

h. Failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII.

120. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

121. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received, and

k. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

122. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II
### BREACH OF IMPLIED CONTRACT
***(On Behalf of Plaintiff and the Class)***

123. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

124. Plaintiff brings this claim individually and on behalf of the Class.

125. When Plaintiff and Class Members provided their PII to Defendant, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiff's and Class Members' PII, comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII, and to timely notify them in the event of a data breach.

126. Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's provision of services. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

127. Implicit in the agreement between Plaintiff and Class Members and Defendant was Defendant's obligation to:

a. Use such PII for business purposes only;

b. Take reasonable steps to safeguard Plaintiff's and Class Members' PII;

c. Prevent unauthorized access and/or disclosure of Plaintiff's and Class Members' PII through proper monitoring and oversight;

d. Provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or disclosure of their PII;

e. Reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized access and/or disclosure at all points of collection, storage, and use; and

f. Ensure that Plaintiff's and Class Members' PII is retained under conditions that kept such information secure and confidential by both Defendant and any third parties with whom Defendant shares such information.

128. When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with Defendant's statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

129. Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII from unauthorized access and disclosure, regardless of whether such information was stored on Defendant's systems. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security and to properly vet, monitor, and oversee any system holding customer information. Defendant failed to do so.

130. Plaintiff and Class Members would not have provided their PII to Defendant had they known that Defendant would not adequately safeguard their PII as promised.

131. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

132. Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII, failing to implement reasonable security measures, and failing to provide them with timely and accurate notice of the Data Breach.

133. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

134. Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII and by failing to provide them with timely and accurate notice of the Data Breach.

135. The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

a. Theft of their PII;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

136. As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

137. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (1) strengthen its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) immediately provide and continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## COUNT III
### BREACH OF FIDUCIARY DUTY
***(On Behalf of Plaintiff and the Class)***

129. Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

130. Given the relationship between Defendant and Plaintiff and Class Members, where Defendant became guardian of Plaintiff's and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

131. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

132. Because of the highly sensitive nature of their PII, Plaintiff and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices, such as Defendant's sharing PII with insufficiently secured third parties.

133. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently protect Plaintiff's and Class Members' PII.

134. Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

135. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## COUNT IV
### UNJUST ENRICHMENT
***(On Behalf of Plaintiff and the Class)***

136. Plaintiff restates and realleges all preceding factual allegations above as if fully set

forth herein and plead the following count in the alternative.

137. Upon information and belief, Defendant funded its data security measures and data-sharing agreements from its general revenue including payments made by or on behalf of Plaintiff and Class Members.

138. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

139. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased services from Defendant and/or their agents and in so doing provided Defendant with their PII.

140. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

141. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

142. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members PII. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits and the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

143. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed

to implement appropriate data management and security measures that are mandated by their common law and statutory duties.

144. Defendant failed to secure Plaintiff and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon Defendant.

145. Defendant acquired Plaintiff's and Class Members' PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

146. If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII, they would not have agreed to provide their PII to Defendant.

147. Plaintiff and Class Members have no adequate remedy at law.

148. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard

Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

149. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

150. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## COUNT V
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
***(On Behalf of Plaintiff and the Class)***

151. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

152. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those

here, that are tortious and violate the terms of the federal and state statutes described herein.

153. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff's and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

154. Pursuant to its authority under 28 U.S.C. §§ 2201, *et seq.*, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure customers' PII and to timely notify customers of a data breach under the common law and Section 5 of the FTC Act; and

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure its customers' PII.

155. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect customers' PII.

156. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant's properties.

157. The risk of another such breach is real, immediate and substantial.

158. If another breach of Defendant's store of customer data occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and he will be forced to bring multiple lawsuits to rectify the same conduct.

159. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft

and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

160. Issuance of the requested injunction will not disserve the public interest but instead benefit the public by preventing another data breach at Defendant's facilities, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and other members of the proposed Class, hereby demands a jury trial on all issues so triable.

Dated: September 5, 2025

Respectfully submitted,

*/s/ Courtney Ross Brown*
Courtney Ross Brown (6340021)
CARNEY BATES & PULLIAM, PLLC
1 Allied Dr. Suite 1400
Little Rock, AR 72202
T: (501) 312-8500
F: (501) 312-8505
cbrown@cbplaw.com

*Attorney for Plaintiff and the Putative Class*